J-A25039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :            PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| KEVIN MAURICE MORGAN | : |
| | : |
| Appellant | :   No. 3048 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 26, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004717-2023

BEFORE:   LAZARUS, P.J., BOWES, J., and FORD ELLIOTT, P.J.E.[*]

DISSENTING MEMORANDUM BY BOWES, J.:          **FILED JUNE 10, 2026**

The learned Majority concludes that the trial court properly denied Appellant the opportunity to present evidence to support his claim of self-defense and correctly refused to issue such an instruction to the jury.  I, however, find that there is record support for Appellant's claim of self-defense.  As such, I would vacate the judgment of sentence and remand for a new trial without reaching the remainder of Appellant's challenges.  Therefore, I respectfully dissent.

The Majority provides most of the relevant factual history of this matter, but more detail is necessary to my analysis, particularly as to the contentious relationship between Appellant and the victim, Derek Mayo.  Notably, the

_____

[*] Retired Senior Judge assigned to the Superior Court.

record reveals that, about ten years prior to this event, Appellant witnessed the murder of his best friend. Although he did not want to cooperate with the investigation, he was placed in a witness protection program and ultimately testified at the trial where the assailant was convicted. Appellant subsequently received threats from acquaintances of the defendant.

At the time, Appellant was dating Kelsay Love, and they had a child together, P.M. When P.M. was approximately three years old, the relationship ended. Ms. Love thereafter began to date Mr. Mayo, who had a connection to the person who murdered Appellant's friend. In the years that followed, Appellant and Mr. Mayo repeatedly engaged in physical and verbal altercations. Mr. Mayo also threatened Appellant in text messages and Facebook posts referencing his decision to testify at the murder trial. Appellant reported these threats to the police, but no action was taken.

Notwithstanding this volatile history, on June 27, 2023, Mr. Mayo accompanied Ms. Love to a custody exchange at Appellant's home. Appellant had previously cautioned Ms. Love never to bring Mr. Mayo to his house, and he became enraged when he opened Ms. Love's car door for P.M. and observed Mr. Mayo in the front passenger seat. During the ensuing verbal altercation, which Appellant prolonged by holding open the vehicle door, Mr. Mayo taunted him, stating "Ah-ha! I know where you live now." N.T. Trial, 6/12/24 at 220. At the time, Appellant had a loaded firearm in his waistband, which he always

carried after witnessing his friend's murder. Ms. Love began to drive away, and Appellant shut the car door.

While Ms. Love was pulling away from Appellant's property, Appellant walked in the direction of the vehicle and spat. Around the same time, Appellant's pregnant wife, Julise Morgan, exited their home and joined Appellant in the grassy portion of the public roadway adjacent to their property. After Ms. Love proceeded a bit further, Mr. Mayo ordered her to stop the car. He exited and walked aggressively toward Appellant and Ms. Morgan. As Mr. Mayo got closer, he repeatedly yelled, "This what you want?" while reaching toward his waist. *Id*. at 224. Appellant believed Mr. Mayo was reaching for a gun, and also heard a threat by Mr. Mayo to kill him. *Id*. at 225-26. As Appellant backed away, Mr. Mayo continued to approach. Appellant withdrew his firearm and shot Mr. Mayo once, killing him.

Appellant's home security camera recorded the events leading up to Mr. Mayo exiting Ms. Love's car. However, once Mr. Mayo alighted from the vehicle, the recording stopped and the remainder of the incident, including the shooting, was not captured.

As the Majority recounts, Appellant was arrested, the matter was scheduled for a jury trial, and the parties filed motions *in limine*. Pertinently, Appellant requested to submit evidence of Mr. Mayo's prior arrests pursuant to Pa.R.E. 404 to support his theory that Mr. Mayo was the aggressor. **See** Pa.R.E. 404(a)(1)-(2) (stating the general principle that "[e]vidence of a

person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait" except in criminal cases where "subject to limitations imposed by statute a defendant may offer evidence of an alleged victim's pertinent trait"). He also sought to present expert witness Frank Datillio, Ph.D., to explain how Appellant's post-traumatic stress disorder ("PTSD") diagnosis affected his belief that Mr. Mayo was going to kill him and his pregnant wife.

In arguing against the admissibility of the Rule 404 evidence, the Commonwealth played the video from Appellant's security camera, which it contended would negate his claim of self-defense. Appellant, however, pointed out that the footage failed to capture what occurred after Mr. Mayo stepped out of the vehicle. He further explained that he planned to testify at trial that Mr. Mayo provoked the deadly situation and Appellant retreated, which his wife would corroborate.

After watching the footage, the court concluded there was no possibility that Appellant could establish a claim of self-defense. Accordingly, it denied his request to present evidence of the victim's propensity for violence and expert testimony from Dr. Datillio. Appellant filed a motion for reconsideration, which the court deferred. After he renewed his motion at trial, Appellant also asked for a jury instruction on self-defense, and the court denied both requests based on the video evidence alone. Specifically, it

concluded that Appellant provoked the deadly confrontation and violated his duty to retreat.

I cannot join my esteemed colleagues in affirming the court's ruling in that regard. The following law guides my analysis of the court's determination that Appellant was not entitled to a claim of self-defense. As our High Court has repeatedly held, a defendant has no burden to prove self-defense. **See Commonwealth v. Mouzon**, 53 A.3d 738, 740 (Pa. 2012). Instead, the focus is whether there is "**some evidence, from whatever source**," demonstrating:

> (a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat.

**Id**. (cleaned up, emphasis added).

Further, "our case law makes it crystal clear that the charge of self-defense must be given upon request where the jury would have a possible basis for finding it." **Commonwealth v. Mayfield**, 585 A.2d 1069, 1071 (Pa.Super. 1991) (cleaned up). "This is so even though the evidence of self-defense may appear to the trial court as not credible, for it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced." **Id**. (cleaned up).

As to the element of provocation, "in order to establish that an actor was the aggressor or provoker and, hence, was not entitled to claim a defense

- 5 -

of self-defense . . ., there must be some evidence to support the inference that the defendant's acts constituted an intent to cause death or serious bodily injury." *Commonwealth v. Samuel*, 590 A.2d 1245, 1248 (Pa. 1991) (cleaned up). Generally, insults "do not suffice to establish the requisite provocation to negate a claim of self-defense." *Mouzon*, 53 A.3d at 738. However, "words combined with conduct can be extremely provocative." *Id*. Additionally, our High Court has held that in situations "[w]here the original assailant becomes the assaulted, it is he who then has a right of self[-] defense." *Commonwealth v. Edwards*, 292 A.2d 361, 364 (Pa. 1972).

With respect to the duty to retreat, "the law does not require an accused to elect an avenue of retreat where a reasonably prudent person would conclude that such a decision would increase his or her exposure to the threatened harm." *Commonwealth v. Ventura*, 975 A.2d 1128, 1143–44 (Pa.Super. 2009) (cleaned up). Instead, the accused must retreat only where "the actor knows that he can avoid the necessity of using such force with complete safety[.]" 18 Pa.C.S. § 505(b)(2)(ii).

The Majority cites *Mouzon* to support its conclusion that Appellant demonstrated an intent to cause death or serious bodily injury to Mr. Mayo, negating his claim of self-defense. However, the facts underlying the Supreme Court's decision in *Mouzon* are distinguishable from those in the case *sub judice*. A brief comparison is instructive. In that case, Mouzon drank for several hours at a bar and approached a group of women who rebuked

him. He proceeded to follow them as they exited down a staircase while "calling them rude names, yelling that they didn't look good, they weren't sh[it], and threatening that he would kill those bitches." *Mouzon*, 53 A.3d at 743 (cleaned up). A male friend escorted the women out of the bar, and at the door he and Mouzon got into "a heated exchange . . . during which [Mouzon] reached for something in his waistband or behind his back." *Id*. A second male friend entered the confrontation and a physical fight ensued between him and Mouzon. It was unclear how the altercation began, but the second friend punched Mouzon multiple times. "Several witnesses testified that [Mouzon] threw no punches, but instead was fumbling for something in his waistband or pocket while [the male] punched him. Ultimately, [Mouzon] pulled a loaded gun from his waistband." *Id*. at 744. Upon seeing the weapon, the male "backed away with his hands raised in the air. Nevertheless, [Mouzon] fired – not once – but twice at [him] from approximately three to four feet away." *Id*.

Our Supreme Court held that Mouzon was not entitled to a claim of self-defense. First, it addressed whether Mouzon provoked the deadly confrontation and acknowledged that "merely insulting or scandalous words of a light or trivial kind do not suffice to establish the requisite provocation to negate a claim of self-defense." *Id*. at 751. However, it continued, "the uncontradicted evidence here shows that [Mouzon]'s words and actions were substantially more provocative than a mere verbal insult" where he followed

the women through the bar and "threatened to kill them, in no uncertain terms."
*Id*. The Court further concluded that Mouzon's use of deadly force was unreasonable because "at the moment [Mouzon] employed deadly force by drawing that weapon and firing twice at [the victim, he] was backing away with his hands raised." *Id*. at 752. For the same reason, the Court held that Mouzon violated his duty to retreat, as the male displayed "the universal symbol of surrender" and Mouzon continued to shoot more than once. *Id*. at 753.

Our law is clear that a claim of self-defense can be borne out through any evidence from whatever source, which would include Appellant's testimony and that of his witnesses. *Id*. at 740. A review of the entire record, not just the footage from the security camera, reflects that Appellant presented sufficient evidence demonstrating he did not provoke the situation with the intent to cause death or serious bodily injury to Mr. Mayo, and he retreated prior to using deadly force. Indeed, the video evidence does not unequivocally contradict Appellant's version of events.

Up until Mr. Mayo alighted from the car, Appellant participated in a heated argument and spat at Ms. Love's vehicle as it drove away. Appellant conceded that he was angry that Ms. Love did not respect his wishes and brought Mr. Mayo to his home, but unlike in *Mouzon*, Appellant did not couple his verbal insults with threats of violence. That Appellant held open the car door to engage in a mutual verbal altercation with Mr. Mayo, and spat toward

the car as it drove away, without any threat of violence, does not evince a desire to cause death or serious bodily injury to Mr. Mayo. *Id*. at 751.

Moreover, the record supports Appellant's theory that Mr. Mayo became the aggressor. When Ms. Love began to drive away to end the verbal confrontation, it was Mr. Mayo's choice to reapproach Appellant. Specifically, the testimony confirmed that Mr. Mayo ordered Ms. Love to stop the car and proceeded to charge at Appellant and his pregnant wife. He threatened to kill Appellant and repeatedly yelled "This what you want?" while reaching toward his hip. Unlike in *Mouzon* where the threats to kill were issued by Mouzon, here it was the victim who incited violence.

Even if I were to assume that Appellant's actions leading up to Mr. Mayo's exit from the vehicle constituted a desire to inflict death or serious bodily injury, which they decidedly did not, Mr. Mayo's rushing of Appellant and Ms. Morgan while threatening them demonstrates that he became the attacker, justifying Appellant's use of protective force. *See Edwards*, 292 A.2d at 364 ("Where the original assailant becomes the assaulted, it is he who then has a right of self[-] defense."). Thus, there was some measure of evidence to establish that Appellant did not provoke the deadly confrontation.

Further, both Appellant and Ms. Morgan testified that Appellant retreated. Once Mr. Mayo began to aggressively approach them, Appellant and Ms. Morgan attested that Appellant backed away. Again, this situation is distinguishable from *Mouzon* where the victim had thrown his hands up to

surrender, and Mouzon still elected to shoot twice. Here, despite Appellant backing away, Mr. Mayo continued to charge at him and his pregnant wife, threatening to kill them. It was from this posture that Appellant shot at Mr. Mayo once. The fact that Appellant could have gone inside his house after the initial verbal altercation had ceased is of no moment where Mr. Mayo incited a new confrontation while threatening death or serious bodily injury. Accordingly, there was some evidence that Appellant did not violate his duty to retreat.

The court therefore committed an abuse of discretion when it focused almost exclusively on the security footage in its analysis. The video did not disprove Appellant's assertion that, after Mr. Mayo stepped out of Ms. Love's car, Appellant did not provoke a deadly confrontation and had retreated. To reiterate, it was not for the trial court to assess the credibility of this evidence. *See Mayfield*, 585 A.2d at 1071. Appellant need only present "some evidence, from whatever source" to substantiate a claim of self-defense. *See Mouzon*, 53 A.3d at 740 Based on the aforementioned testimony, I cannot join my esteemed colleagues in concluding that the trial court correctly determined that there was no evidence to support a theory of self-defense.

Thus, I would vacate Appellant's judgment of sentence and remand for a new trial where Appellant is permitted to present a justification defense. If presented, the court should then determine whether the expert testimony of Dr. Datillio is germane to Appellant's claim of self-defense. Similarly, if

proffered, the court must analyze whether the evidence regarding Mr. Mayo's propensity for violence is admissible.[1]  Further, at the close of evidence, the court would be required to instruct the jury on self-defense and, if applicable, imperfect self-defense.[2]

_____

[1] Relevantly, where a defendant claims self-defense:

> Evidence of the victim's prior convictions involving aggression may be admitted, if probative, either (1) to corroborate the defendant's alleged knowledge of the victim's violent character, to prove that the defendant was in reasonable fear of danger, or (2) as character/propensity evidence, as indirect evidence that the victim was in fact the aggressor.

**Commonwealth v. Christine**, 125 A.3d 394, 398 (Pa. 2015) (cleaned up). Only "past crimes of the victim that are similar in nature and not too distant in time will be deemed probative, with the determination as to similar nature and remoteness resting within the sound discretion of the trial judge." **Mouzon**, 53 A.3d at 741 (citation omitted).

[2] As explained by the Majority, a claim of imperfect self-defense is identical to a claim of self-defense except that it entails "an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life." **Commonwealth v. Bracey**, 795 A.2d 935, 947 (Pa. 2001) (cleaned up). Otherwise, "all other principles of justification under 18 Pa.C.S. § 505 must still be met in order to establish unreasonable belief voluntary manslaughter." **Id**. (cleaned up).